NOT FOR PUBLICATION

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|                          |   |                                   |
|--------------------------|---|-----------------------------------|
| HAKEEM CURRY,            | : |                                   |
|                          | : | Civil Action No. 11-5800 (FSH)    |
| Petitioner,              | : |                                   |
|                          | : |                                   |
| v.                       | : | **OPINION**                       |
|                          | : |                                   |
| UNITED STATES OF AMERICA, | : |                                   |
|                          | : |                                   |
| Respondent.              | : |                                   |
|                          | : |                                   |

**HOCHBERG**, District Judge:

Presently before the Court is the motion of Hakeem Curry[1] ("Petitioner" or "Curry")

brought pursuant to 28 U.S.C. § 2255. Respondent, United States of America, filed an Answer

and Petitioner filed a Reply. This Court presided over the criminal proceedings in this case from

2004 through a long and hotly-contested trial which this Court vividly recalls. In addition, Curry

and counsel were in Court for innumerable pretrial proceedings. Because this trial was

noteworthy in many respects the Court's observations of Curry's demeanor, including his

intelligence, skill at directing others to do his will, shrewd knowledge of the legal system from

managing the legal representation of members of his drug trafficking organization, and personal

charisma inform this Court's knowledge of the facts and procedural history of this case.

As the Court earlier wrote, there was extraordinary opportunity to observe the close

interaction and rapport of the Defendant and his trial team, James Plaisted and Lin Solomon of

---

[1]  The spelling of Petitioner's name is actually "Currie," as the Court has noted previously.
However, in an effort to remain consistent with the Court's filing system and all of the numerous
filings in this case, this Opinion will continue to refer to Petitioner as Curry.

the firm of Walder, Hayden & Brogan, P.A.

## I.     BACKGROUND AND PROCEDURAL HISTORY[2]

On March 4, 2004, Drug Enforcement Administration ("DEA") agents arrested Lachoy

Walker, a member of Hakeem Curry's violent drug organization, and recovered 100 bricks of

heroin and a firearm.  Walker began cooperating with the DEA.  Walker told the DEA, among

other things, that Curry had enlisted him to store and assist in distributing heroin and that Curry

had given him the heroin and firearm the DEA recovered.  On March 5, 2004, Curry was arrested

after Walker, under the supervision of the DEA agents, performed a controlled delivery of the

heroin to Curry.  Vincent Nuzzi, Esq. filed a notice of appearance on March 10, 2004, five days

after Curry's arrest.

On July 16, 2004, Petitioner was indicted on a Superseding Indictment, along with Rakim

Baskerville and then 8 other co-defendants,[3] with one count of conspiracy to distribute and to

possess with intent to distribute 5 kilograms or more of cocaine, as well as conspiracy and

distribution charges relating to a quantity of heroin, Curry then retained Walder, Hayden &

Brogan, P.A., partner James Plaisted, Esq., associate Lin Solomon, Esq., and then-associate

Christopher Adams, Esq. to join Mr. Nuzzi in his representation.  Between October 2004 and

May 2006, Mr. Plaisted authored all discovery letters, filed all motions, and argued nearly all of

the numerous substantive legal issues in Court.

On March 30, 2005, a Second Superseding Indictment was filed which (1) deleted two

---

[2]  The facts set forth in this background and procedural history were gleaned from Petitioner's Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside or Correct Sentence ("Petitioner's Mot."), the criminal docket for the underlying case ("Docket"), *United States v. Curry*, Criminal Action No. 04-280(FSH), and this Court's entire file.

[3]  Originally, all 10 Defendants were not charged in a single indictment.

defendants who were pleading guilty, (2) augmented the conspiracy allegations, and (3) added money laundering charges against Curry.  On February 3, 2006, a Third Superseding Indictment was filed, adding an additional defendant, extending the length of the conspiracy and adding substantive distribution charges against two named defendants.

On May 9, 2006, Mr. Nuzzi requested permission to withdraw from the case due to a conflict of interest related to his representation of both Curry and an uncharged associate of the Curry Organization, Raheem Webb.[4]  On May 11, 2006, following a lengthy hearing on the nature and extent of the conflict, the Court granted Mr. Nuzzi's request to withdraw from the case. Although Curry still retained the services of Mr. Plaisted, his associates and his law firm, Curry asked for a lengthy continuance to retain additional counsel to replace Mr. Nuzzi.  The Court denied Curry's application, instead granting a shorter continuance for all of the reasons stated in this Court's Statement of Reasons, filed February 13, 2007, explaining in great depth why it was required to grant Mr. Nuzzi's request to withdraw from the case and why it denied Curry's

---

[4]  Sometime after April 6, 2006, Mr. Nuzzi reviewed transcripts of two February 2004 wiretap recordings that captured Curry discussing funneling money to the family of co-conspirator Raheem Webb so that Webb could hire Mr. Nuzzi as defense counsel.  Webb had been charged with resisting arrest in connection with the December 2003 arrest of Justin and Jason Hannibal for possessing $60,000 worth of Curry's heroin, and Mr. Nuzzi had in fact represented Webb in that matter.  On April 20, 2006, shortly before the final trial date, Mr. Nuzzi for the first time raised with the Government the potential conflict created by these calls.  The Government suggested redacting Mr. Nuzzi's name from the transcripts, but Mr. Nuzzi demanded that the prosecutor not introduce the calls into evidence.  When the Government raised the conflict with the Court on May 8, 2006, Mr. Nuzzi replied that "if the Government intends to introduce [the recordings] and/or raise the fact that Raheem Webb was arrested with Justin Hannibal, I would be forced to withdraw from this case."  This Court held a hearing on May 11, 2006 to examine the nature of the conflict.  The Government intended to prove the conspiracy by showing, *inter alia*, that Curry routinely arranged bail and hired counsel for underlings who had been arrested, including using at trial the two February 2004 recordings to show Curry's role in arranging the legal representation of Webb.  Mr. Nuzzi explained that this would require Curry to call either Webb, Mr. Nuzzi's former client, or Mr. Nuzzi as a witness to rebut the inference raised by the recordings, creating an actual conflict and forcing Mr. Nuzzi's withdrawal.  The Court agreed that there was an actual, unwaivable conflict, and granted Mr. Nuzzi's request to withdraw.

3

request for a longer continuance of the trial date.  *United States v. Curry*, Crim. No. 04-280 (D.N.J. Feb. 13, 2007) (opinion regarding grant of counsel's motion to withdraw and denial of further continuances).

Following lengthy jury selection, trial in the matter began on May 22, 2006.  After a trial that lasted 37 days and involved testimony from 35 witnesses, Petitioner was convicted of conspiracy to distribute and possession with intent to distribute five kilograms or more of cocaine and one kilogram or more of heroin in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A) and 21 U.S.C. § 846, as well as possession with intent to distribute 100 grams or more of heroin in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A) and nine counts of money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(I).

The evidence introduced against Curry was overwhelming.  Walker testified over multiple days about the intricate details of Curry's drug operation, including Curry's role as leader. Walker's testimony established each element of the drug conspiracy charge.  In addition, the Government introduced substantial additional evidence that both corroborated Walker's testimony, and independently established Curry's guilt.  For example, the Government introduced evidence of:

1.  consensually recorded conversations between Curry and Walker in which Curry, among other things, directed Walker to continue to hold drugs Curry had given to Walker and asked Walker about the firearm Curry had previously given to Walker;
2.  134 wiretapped conversations involving Curry and his co-conspirators demonstrating that Curry and his co-conspirators were operating a large-scale, highly lucrative drug trafficking organization;
3.  kilograms of cocaine and large quantities of heroin seized from members of the Curry Organization;
4.  eyewitness testimony of physical surveillance of the activities of Curry and his associates;
5.  evidence seized from Curry's drug stash house and other locations utilized by the organization, including drug records, drug paraphernalia, ammunition and a firearm;
6.  records of Curry's activities, including bail records of Curry's underlings, travel records, records of purchases of expensive jewelry, and records of his purchases of luxury automobiles;
7.  testimony from the straw-purchasers of Curry's luxury automobiles;

4

8.  expert testimony that coded language contained in wiretapped calls related to drug trafficking, that Curry's use of straw-purchasers to obtain luxury automobiles was consistent with one of the methods used by drug dealers to launder illicit proceeds, that chemical analysis of the various drugs seized proved they were controlled substances, and that the drugs from three separate seizures – namely, the December 2003 seizure of heroin from Jason Hannibal, Justin Hannibal and Raheem Webb, the March 4, 2004 seizure of heroin from Walker, and the January 8, 2004 seizure of heroin from Rakeem Baskerville's van – came from the same source;

9.  testimony of a second cooperating co-conspirator who was an eyewitness to specific instances of Curry's drug trafficking; and

10.  testimony of a third cooperating co-conspirator who was an eyewitness to Curry's plot to kill Walker to prevent Walker from testifying.

Curry retained Lawrence Lustberg, Esq. to appeal his conviction.  Mr. Lustberg filed an extensive brief arguing, among other things, that: (1) the Government used evidence derived from improperly sealed wiretaps to prosecute and convict him; and (2) he was prejudiced because this Court denied his request for a lengthy continuance and forced him to go to trial with counsel who was not of his choosing, who was unprepared to defend the case, and who committed numerous serious errors during trial.  The United States Court of Appeals for the Third Circuit rejected Curry's arguments, upheld the conviction, and found that Curry suffered no prejudice as a result of the Court's denial of his request for a lengthy continuance.  *United States v. Baskerville,* 339 F. App'x 176, 178 (3d Cir. 2009).

Having lost his appeal, Petitioner now brings this Motion to Vacate, Set Aside, or Correct his Sentence pursuant to 28 U.S.C. § 2255.  Petitioner argues that:  (1) counsel was constitutionally ineffective for failing to obtain a taint hearing, seeking suppression of evidence derived from what are claimed to be multiple illegal and improperly sealed wiretaps; (2) counsel was constitutionally ineffective for failing to discover, prevent, and/or prepare for the conflict of interest of Mr. Nuzzi that required him to proceed with counsel that was unprepared to try his case; (3) counsel was constitutionally ineffective and violated Petitioner's Fifth Amendment rights by failing to adequately advise petitioner regarding his right to testify at trial; (4) trial

counsel was constitutionally ineffective for failing to call witnesses; (5) counsel was

constitutionally ineffective for failing to properly examine key witnesses; (6) counsel was

constitutionally ineffective for failing to properly object, leading to admission of evidence that

was improper or prejudicial; (7) other trial errors of counsel; and that (8) counsel's cumulative

errors violated Petitioner's Sixth Amendment right to effective assistance of counsel.

## II. DISCUSSION

### A. LEGAL STANDARD

A prisoner in federal custody may file a motion pursuant to 28 U.S.C. § 2255 challenging

the validity of his or her sentence.  Section 2255 provides, in relevant part, as follows:

> A prisoner in custody under sentence of a court established by Act
> of Congress claiming the right to be released upon the ground that
> the sentence was imposed in violation of the Constitution or laws
> of the United States, or that the court was without jurisdiction to
> impose such a sentence, or that the sentence was in excess of the
> maximum authorized by law, or is otherwise subject to collateral
> attack, may move the court which imposed the sentence to vacate,
> set aside or correct the sentence.

28 U.S.C. § 2255.

Unless the moving party claims a jurisdictional defect or a Constitutional violation, the

moving party must show that an error of law or fact constitutes "a fundamental defect which

inherently results in a complete miscarriage of justice, (or) an omission inconsistent with the

rudimentary demands of fair procedure."  *United States v. Horsley*, 599 F.2d 1265, 1268 (3d Cir.

1979) (quoting *Hill v. United States*, 368 U.S. 424, 429 (1962)).

## B.  THE CLAIM OF INEFFECTIVE ASSISTANCE OF COUNSEL

The Sixth Amendment[5] guarantees criminal defendants the right to effective assistance of counsel.  *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970).  In order to succeed on a claim of ineffective assistance of counsel, Petitioner must satisfy the two prong test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984).  First, Petitioner must show that counsel's performance (viewed as of the time of counsel's conduct) was inadequate and "fell below an objective standard of reasonableness," in that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed [to] the defendant by the Sixth Amendment."  *Id.* at 687–688.  Petitioner must then show that the deficient performance prejudiced the defense.  In other words, Petitioner must prove that there was "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id.* at 694.

The United States Supreme Court reiterated that "[s]urmounting *Strickland's* high bar is never an easy task."  *Padilla v. Kentucky*, 559 U.S. 356 (2010).  Because "[a]n ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial," the Supreme Court has admonished lower courts that the "*Strickland* standard must be applied with scrupulous care...."  *Harrington v. Richter*, ___ U.S. ___, ___, 131 S. Ct. 770, 788 (2011).  "It is 'all too tempting' to 'second-guess counsel's assistance after conviction or adverse sentence,'" however, "[t]he question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom."  *Harrington*, 131 S. Ct. at 788 (quoting

---

[5]  The Sixth Amendment guarantees that, "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defense."  U.S. Const. VI.

*Strickland*, 466 U.S. at 690) (internal citations omitted).

In order to pass the prejudice prong, Petitioner must show, with reasonable probability, that but for the counsel's professional incompetence, the outcome of the proceeding would have been different. *Id.* at 694. "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding. Virtually every act or omission of counsel would meet that test." *Id.* at 693.

Petitioner asserts that he received ineffective assistance of counsel, including counsel who represented him pretrial and at trial. Specifically, Petitioner claims that counsel who represented him pretrial, and whom he desired to be trial counsel, was ineffective because he failed to obtain a taint hearing or seek suppression of evidence, and failed to discover and adequately prepare for the conflict of interest. Petitioner asserts trial counsel was ineffective because he allegedly failed: (1) to adequately advise Petitioner of his right to testify; (2) to call or investigate the possibility of calling defense witnesses; (3) to conduct effective cross-examination of key witnesses; (4) to object to inadmissible evidence; (5) to adequately prepare for trial; and (6) to conduct an adequate defense. The Court considers each allegation of ineffective assistance pursuant to the *Strickland* test. The Court will take each of these in turn in order to determine whether Petitioner has met both prongs of the *Strickland* test.

### i. Counsel's Alleged Failure To Obtain A Taint Hearing

Petitioner argues that counsel failed to obtain a taint hearing or seek suppression of evidence derived from the certain improperly sealed wiretaps.[6]  Curry argues that while Mr.

---

[6]  As a part of their investigation of the Curry Organization, the Government wiretapped seven different cell phones between September 12, 2003 and March 1, 2004. The first of these wiretaps occurred on September 12, 2003, when the court ordered wiretapping on a cell phone used by Ishmael Pray (hereinafter "the Pray Facility"). The court extended the wiretapping on October 10, 2003 on the Pray Facility until November 8, 2003. When the October 10, 2003

8

Plaisted made a motion for a taint hearing, he was ineffective because he should have done a better job of arguing for a hearing by citing specific instances in which the Government used tainted evidence at trial.  The Government counters, arguing that: (1) Mr. Plaisted did not cite examples of the Government using tainted evidence in his motion for a taint hearing because there were no such examples; and (2) just because counsel could have presented the argument more forcefully, or presented more facts to support it, does not mean that the argument he actually presented fell below the level of competence demanded by the Sixth Amendment.  *See Buehl v. Vaughn*, 166 F.3d 163, 180 (3d Cir. 1999) ("a lawyer's failure to perceive the ground

---

Extension Order expired, the recordings intercepted over the Pray Facility were properly sealed by a United States District Judge in accordance with 18 U.S.C. § 2518(8)(a).  Between October 10, 2003 and January 2004, the court ordered wiretapping over additional cell phones used by Curry, Pray, and Atif Amin.  The conversations that were intercepted in accordance with these orders were sealed by a District Judge in accordance with 18 U.S.C. § 2518(8)(a).

However, sometime before February 17, 2004 the Government determined that the sealing of these recordings may have been untimely, and that calls may have been intercepted over the Pray Facility after the October 10, 2003 Extension Order expired.  As a result, the Government decided it would not rely on:  (1) lawfully intercepted calls that may not have been properly sealed; and (2) calls intercepted over the Pray Facility after November 8, 2003 (hereinafter "the Unused Calls") in any subsequent applications or court proceedings.

Accordingly, in its February 17, 2004 application to wiretap another of Curry's and Amin's cell phones (hereinafter "the Curry 4 Facility" and "the Amin 2 Facility"), the Government relied on other evidence.  The recordings intercepted over the Curry 4 and Amin 2 Facilities were properly sealed by a District Judge pursuant to 18 U.S.C. § 2518(8)(a).  The Government also decided not to rely on the Unused Calls for any other purpose.  Instead, when seeking to obtain various arrest and search warrants, when swearing out complaints against various defendants, and when presenting the case to the Grand Jury, the Government relied on evidence that came from calls intercepted over the Pray Facility during the court-sanctioned time-frame, the Curry 4 Facility, and the Amin 2 Facility, as well as other non-wiretapping evidence.

After Curry's indictment and during discovery, the Government produced the Unused Calls to Defendants.  Curry initially sought an order suppressing the late-sealed calls without arguing for fruits suppression or demanding a taint hearing.  Curry's counsel later expanded this motion, arguing that all of the conversations obtained by the Government were obtained by illegal wiretapping.  "Before the government can introduce any evidence in this case," Curry argued, "it must prove that such evidence was independently obtained and was unconnected to the illegal tapes."  This Court ultimately ordered the Government "not [to] introduce calls from the unused Eavesdropping period."

9

for crafting an argument that might have succeeded is very different from the failure to meet the level of competence required by the Sixth Amendment").

Section 2517(3) permits a person who has received information derived from a lawfully intercepted communication to "disclose the contents of that communication or such derivative evidence while giving testimony under oath or affirmation in any proceeding held under the authority of the United States." 18 U.S.C. § 2517(3). Section 2518(8)(a) provides that "[t]he presence of the seal provided for by this subsection, or a satisfactory explanation for the absence thereof, shall be a prerequisite for the use or disclosure of the contents of any wire, oral, or electronic communication or evidence derived therefrom under subsection (3) of section 2517." 18 U.S.C. § 2518(8)(a). Section 2518(8)(a), therefore, clearly prohibits the Government from using at trial the contents of lawfully intercepted, but improperly sealed, conversations or the tapes or transcripts derived therefrom. *See United States v. Ojeda Rios*, 495 U.S. 257, 260 (1990) (noting that § 2518(8)(a) contains "an explicit exclusionary remedy"). It is undisputed that the Government obeyed that prohibition by declining to introduce the late-sealed calls into evidence at trial.

### a. Counsel's Performance Was Objectively Reasonable

The Government was aware of the sealing issue prior to bringing charges against Curry and his co-defendants. The Government analyzed the evidence and segregated from the case any and all evidence that may have been tainted. Realizing the potential consequences of using tainted evidence, the Government erred on the side of caution when determining what may have been tainted evidence. Although not required to do so, the Government segregated out not only the evidence derived from the late sealed calls, but also any fruits of that evidence. After performing this analysis, the Government only used evidence it was confident was not subject to

any potential taint when it prosecuted the case.  As a result of this proper exercise of caution by the United States Attorney's Office, Curry's counsel Mr. Plaisted could not cite any examples of the Government using tainted evidence.  Even now, new counsel does not do so.[7]

Curry does not explicitly use the term "fruits" in describing what evidence he believes should have been the subject of a taint hearing.  He does not claim that any improperly sealed wiretap conversations were used during the prosecution; rather, he complains, without any factual basis, that physical surveillance, seizures based upon search warrants and testimony of cooperating witnesses must have been obtained as a result of improperly sealed wiretap conversations.  Curry's argument also assumes, without citing any legal support, that the fruits of improperly sealed wiretap conversations are subject to suppression under 18 U.S.C. § 2518.  The United States Court of Appeals for the Third Circuit has never so held.  Moreover, other courts addressing the issue have specifically held that fruits evidence are not subject to suppression.  Curry's ineffectiveness claim thus relies on the legal premise that his counsel was ineffective for not seeking suppression on a legal ground that did not exist, and without factual showing that improper evidence was entered at trial.

To find in Curry's favor, this Court would have to find that:  (a) § 2518(8)(a)'s phrase "evidence derived therefrom" mandated suppression of not only the conversations, but of any other fruits evidence causally related to those conversations by a chain of events, (b) counsel was ineffective for not raising this ground, and (c) there was evidence that should have been suppressed on this ground.  None of this occurred here.  The Third Circuit has never adopted that

---

[7]  While Curry attacks Mr. Plaisted for not "com[ing] forward with specific evidence demonstrating taint," Curry also fails to do so.  Instead, Curry assumes that there must have been tainted evidence, but cites to only a few examples of what he claims are tainted evidence. However, none of his examples were actually derived from illegally intercepted or improperly sealed wiretap evidence.

interpretation, see *United States v. Carson*, 969 F.2d 1480, 1500 (3d Cir. 1992) ("we expressly reserved this issue for future decision and it remains an open question"); *United States v. Vastola*, 915 F.2d 865, 876 n.19 (3d Cir. 1990) ("we . . . express no opinion on the issue at this time."). Thus, it is exceedingly difficult to argue that counsel failed the Strickland test for not pressing that theory after losing his pretrial motion, especially because the circuits that have addressed the issue have uniformly rejected such an interpretation of the statute.

The Second Circuit has concluded that "derived therefrom" does not mean "causally related to an untimely sealed intercept by a chain of events that includes an arrest or search lawfully based on untimely sealed intercepts." *United States v. Donlan*, 825 F.2d 653, 656 (2d Cir. 1987). Rather, it refers only to "transcripts, duplicate tapes, work copies and testimonial summaries" of the intercepted conversations. *Id.* at 657 (quotation marks and citation omitted). Accordingly, the Second Circuit has declined to suppress intercepted conversations where the affidavit for a wiretapping order relied on the contents of earlier, improperly sealed conversations. *See United States v. Amanuel*, 615 F.3d 117, 128 (2d Cir. 2010) ("our case law is clear that the prohibition on the use of improperly sealed evidence in sworn testimony will not preclude the use of such evidence either to pursue an investigation or to prove up the fruits of such investigation at trial"). *See also United States v. Fury*, 554 F.2d 522, 532 (2d Cir. 1977); *see also United States v. Saucedo*, 446 F. Supp. 2d 824, 827-28 (N.D. Ill. 2006).[8] Since it is undisputed that the Government did not use at trial the contents of lawfully

---

[8]   The Second Circuit's construction is persuasive for two reasons. First, § 2518(8)(a) cross-references only subsection (3) of § 2517, but not subsections (1) or (2). Congress, therefore, consciously permitted law enforcement officers: (1) to disclose information gleaned from improperly sealed conversations to other officers for use in performance of their duties, § 2517(1); and (2) to use such information as necessary in the performance of their duties, § 2517(2), including "to establish probable cause for arrest ... [or] to search," S. Rep. No. 1097, 90th Cong., 2d Sess. 99, reprinted in 1968 U.S. Code Cong. & Admin. News 2112, 2188.

intercepted, but improperly sealed, conversations or the tapes or transcripts derived therefrom, Curry's ineffectiveness claim fails. Moreover, even if fruits evidence had been subject to suppression, any such argument still fails because no fruits evidence was actually used in the prosecution of the case.[9]

Curry has all of the discovery materials, which demonstrate that the prosecution team did not use improperly sealed conversations when applying for additional wiretap orders, search warrants, complaints, or when presenting the case to the grand jury. Curry has the entire trial transcript and every item of evidence introduced at trial. Yet Curry does not cite a single specific example in which the Government used allegedly tainted fruits evidence in the prosecution of this case. Trial counsel cannot now be accused of ineffective representation based on a meritless

---

Construing § 2518(8)(a) in the manner relied upon by Curry would prohibit officers from using improperly sealed calls in a sworn affidavit submitted to a Court for the issuance of a search/arrest warrant, even though § 2517(1) and (2) permits officers to rely on those same calls to make warrantless searches/arrests. *Donlan*, 825 F.2d at 656.

    Second, the sealing requirement is not one of "those statutory requirements that directly and substantially implement the congressional intention to limit the use of intercept procedures to those situations clearly calling for the employment of this extraordinary investigative device." *Giordano*, 416 U.S. at 527. To the contrary, § 2518(8)(a) does not limit the use of intercept procedures. All § 2518(8)(a) addresses is the proper procedure for admitting lawfully intercepted recordings, rendering admissible those that are immediately sealed, and rendering inadmissible those whose authenticity may be questioned because they were not properly sealed. But so long as the Government has intercepted the call in conformity with Title III, failing properly to seal that call does not prevent the Government from relying on the information to further its investigation. *See Amanuel*, 615 F.3d at 128-129; *Fury*, 554 F.2d at 532; *United States v. Royster*, Crim. No. 07-16, 2007 WL 4336321, at *17-18 (M.D. Ga. Dec. 7, 2007) (fruits "suppression is only an appropriate remedy if it is required under the statutory scheme," and § 2518(8)(a) does not require fruits suppression); *United States v. Local 1804-1, Int'l Longshoremen's Ass'n*, 812 F. Supp. 1303, 1324-25 (S.D.N.Y. 1993).

[9] The February 17th Affidavit specifically states under oath that the affiant does not rely on any evidence derived from the potentially tainted wiretaps. Thus, Curry's claims that the Government must have used some unspecified fruits of tainted evidence in obtaining the February 17, 2004 orders and in prosecuting the case are meritless. It should have been raised in his direct appeal in any event.

legal theory with no facts to support it.  Curry now argues that counsel was ineffective for not seeking to suppress all of Walker's testimony as an alleged "fruit" of tainted evidence. However, Walker was arrested based upon an outstanding warrant, issued from Essex County Superior Court, not upon evidence gathered during the wiretap.  And while Curry claims that Walker was identified during the period of the improperly sealed wiretaps, the trial record demonstrates that the DEA task force officer first physically identified Walker approximately four months before any wiretapping commenced.[10]

In like vein, Curry now claims that the Government relied on improperly sealed wiretap conversations in searching the drug stash house known as "the dungeon."  Curry erroneously states "the February [17th] Affidavit clearly noted that the wiretaps had identified residences and a 'stash house'" and then concludes that trial counsel "should have immediately called for the suppression of evidence obtained at the only stash house introduced into evidence, the so-called 'dungeon.'"  The February 17th Affidavit, in fact, states the exact opposite: the only information about stash houses was provided by informants, not wire intercepts.  Indeed, the dungeon is not even mentioned in the February 17th Affidavit.  Moreover, as set forth in the affidavit in support of a search warrant for 353 South Center Street, Orange, New Jersey, the apartment the Curry Organization referred to as the dungeon (hereinafter the "Dungeon Affidavit"), the probable cause for the search was not based upon any wiretap conversations, but rather, upon information

---

[10]  While Walker had been identified as a co-conspirator before wiretapping began, law enforcement did not learn of Walker's true identity, i.e., his full name, until February 2004. More specifically, as set forth in paragraphs 20 and 21 of the February 17th Affidavit, law enforcement learned Walker's full name during a February 5, 2004 interview with a confidential informant, identified as "CS-8."  As trial counsel had received discovery copies of, and obviously reviewed, the February 17th Affidavit prior to filing motions, trial counsel was well aware that Walker was not identified as a result of wiretapping.

provided by confidential informants.  In addition, the location of the "dungeon" was provided by Walker after his arrest on March 4, 2004 after eavesdropping had ceased.  Because the February 17th Affidavit and the Dungeon Affidavit were provided in pretrial discovery, trial counsel well understood that the search of the dungeon was not based upon evidence derived from the improperly sealed wiretap conversations.  That trial counsel chose to forego filing a frivolous motion does not make him constitutionally ineffective.  *See United States v. Kennedy*, 354 F. App'x 632, 637-38 (3d Cir. 2009) (not precedential) (reversing grant of a new trial where counsel was not negligent for failing to raise a meritless chain-of-custody argument).

Similarly, Curry now claims that the Government's identification of co-conspirator witness David Lyons was the fruit of allegedly tainted wiretap conversations.  The trial record, however, clearly indicates that Lyons and each of the co-conspirators discussed at trial were identified based upon eavesdropping over the Pray Facility, which was properly sealed.[11]

### b.  Petitioner Was Not Prejudiced By Counsel's Performance

Even if this Court had determined that Mr. Plaisted should have alleged specific instances in which the Government used fruits evidence, Curry cannot show prejudice.  First, because fruits evidence is not subject to suppression under 18 U.S.C. § 2518, counsel can hardly be faulted for not filing a legally meritless motion.  And had Mr. Plaisted cited the same examples that Curry now cites in his brief, the Government would have been able to demonstrate factually that the evidence was not the fruits of late-sealed calls.

---

[11]  Petitioner offers vague speculation that the money laundering charges were derived from allegedly tainted evidence but fails to specify a single example in which the Government used tainted fruits evidence in support of the money laundering charges.   As the trial record clearly demonstrates, the Government only used calls intercepted pursuant to the February 17, 2004 eavesdropping order to establish the money laundering charges and Curry acknowledges that those conversations were properly sealed.

Thus, there are no facts of tainted fruits; even had there been any, tainted fruits was not a legally recognized ground for suppression; counsel was not ineffective for not filing a groundless motion; and Curry thus cannot show any prejudice.  *See Snow v. Sirmons*, 474 F.3d 693, 723 (10th Cir. 2007) (where defendant failed to show "that any such objection or motion to suppress would have been successful," he "cannot show he suffered prejudice as a result of his attorney's actions").

### ii.  Counsel's Alleged Failure To Discover And Adequately Prepare For Nuzzi's Conflict Of Interest

Curry now contends that his counsel failed to discover, anticipate, prevent, or prepare for the conflict of interest that caused Mr. Nuzzi to move to withdraw from the Curry trial team. Petitioner claims that he hired Mr. Nuzzi because of his skill and reputation as a trial attorney and that he later retained Walder, Hayden & Brogan, P.A. due to their skill and reputation with regard to their legal research and brief writing.  The Government argues that Curry, earlier in the long record of this case, conceded that Mr. Nuzzi provided effective assistance to him.

### a.  Counsel Was Not Ineffective In Handling The Conflict Issue

Curry now claims that Mr. Nuzzi was ineffective for not recognizing a potential conflict of interest earlier than he did.  In Mr. Lustberg's August 3, 2007 appellate brief to the Third Circuit, Curry strongly defended Mr. Nuzzi's handling of the conflict issue, arguing, *inter alia*, that: (1) "there is absolutely nothing in the record to suggest that [Mr.] Nuzzi acted inappropriately;" (2) Mr. Nuzzi's late discovery of the conflict was the result of the prosecution's actions; and (3) "[Mr.] Nuzzi's hope that the prosecution would not use [the tapes which evidenced the conflict] was reasonable."  Clearly, Curry has conceded that Mr. Nuzzi provided effective assistance of counsel with respect to the conflict issue.  That argument was unsuccessful on appeal.  Petitioner cannot now flip the argument, claiming Mr. Nuzzi was

16

ineffective on the conflict issue.[12]

### b. Curry Suffered No Prejudice

Curry claims he was prejudiced by the timing of Mr. Nuzzi's withdrawal because he was forced to proceed at trial with an attorney whom he did not trust and who was unprepared for trial. However, the Third Circuit's appellate opinion also forecloses any finding of prejudice. Curry claimed on direct appeal that this Court had arbitrarily denied him a continuance and forced Mr. Plaisted to trial with inadequate time to prepare. The Third Circuit rejected Curry's claim, stating that this Court's "decision to only grant a limited continuance to allow Mr. Plaisted and Ms. Solomon to prepare for opening statements was neither arbitrary nor prejudicial." *Baskerville*, 339 F. App'x at 178. *See Sonneberg v. United States*, No. 01–2067, 2003 WL 1798982, at *2 (3d Cir. 2003) (movant "may not relitigate issues that were decided adversely to him on direct appeal by means of a Section 2255 petition") (citing *United States v. DeRewal*, 10 F.3d 100, 105 n. 4 (3d Cir. 1993)).[13]

---

[12] It is also worth noting that, as this Court noted in its Statement of Reasons filed on February 13, 2007, the last minute attempt by Nuzzi to raise the conflict of interest appeared to be part of an orchestrated strategy between Curry and Nuzzi to, *inter alia*, have otherwise proper evidence suppressed, and/or obtain another last minute adjournment of the case that previously had been unsuccessfully sought via a mandamus petition to the Third Circuit. *In Re: Hakeem Curry*, No. 06-2356 (3d Cir. May 8, 2006); *See also Bridges v. United States*, 794 F.2d 1189, 1194 (7th Cir. 1986) (defendant sought "to benefit from his own informed choice of" conflicted counsel in a manner that "smacks of bad faith and of a deliberate design to lay a groundwork for this appeal when all else had failed").

[13] Having no right to relitigate the legal issue, it is unnecessary to address Curry's claim of prejudice. However, in fairness to a well-prepared and zealous defense lawyer, this Court must correct some of the inaccurate claims that are now being said about Mr. Plaisted. Mr. Plaisted at all times zealously and effectively represented Curry. Curry now strings together three different statements to create the false impression that this Court chastised Mr. Plaisted for the strategic decision to cross-examine Walker with the Government's promise to put Walker in the witness protection program.

The first part of the cite is to a colloquy discussing the ramifications if Mr. Plaisted asked Walker about the Government's promise of witness protection. In seeking an advance ruling, Mr. Plaisted claimed it was relevant cross-examination material because the Government had

bestowed a benefit on Walker. This Court ultimately stated that it was not going to give Mr. Plaisted a ruling in advance on the issue, stating "If you bring out the Witness Protection Program, people know what that means, so you're going to have to go with that. And I don't know why you're doing that but if you want to do it I am not going to stop you from doing it." Far from chastising Mr. Plaisted, this Court merely explained that it was not ruling in Mr. Plaisted's favor on an issue after hearing argument.

The second and third portions of Curry's citation relate to a completely different topic. Mr. Curry's wife was likely to be called as a defense witness. There had been testimony from Walker that Curry's wife had transported some of Curry's drug money. Upon hearing that testimony, this Court indicated that Mr. Plaisted should consider getting independent counsel for Mrs. Curry to advise her on this issue if she did become a defense witness. When the issue was first raised, Mr. Plaisted did not object to this Court's proposal. When he later filed a motion arguing that the proposal was erroneous, this Court first told Mr. Plaisted "if you have an objection raise the objection [when the issue arises]." At the conclusion of the colloquy, this Court told Mr. Plaisted it was okay to "be zealous but be candid. And I'm just saying that because I think you're a great lawyer, you know I always thought you're a great lawyer, but there is a point at which there are boundaries of good practice." While Mr. Plaisted's actions may have been argumentative or poorly timed, they were not constitutionally ineffective. If anything, they showed how dedicated he was to raise any issue he thought was helpful to his client. Mrs. Curry did in fact testify as a defense witness.

Curry leaves out other important portions of these same colloquies in which this Court praised Mr. Plaisted's work. For example, this Court told Mr. Plaisted, "I appreciate very much how hard you're working, you're doing a fabulous job on behalf of your client," and "I think you're doing a fine job." To the extent this Court's statements can be characterized as chastising, which they cannot, this Court also made similar comments to the Government lawyers in that same colloquy. By way of example, this Court instructed: "Mr. Frazer, I don't like the sniping . . . We're going to try this as a straight case, no snapping at each other, no sniping, no carrying on. This is going to be straight up as two professionals or three professionals or four professionals or five professionals, however many you are can try a case and I'm going to hold every one of you to that." This Court then told both the Government and the defense that it wanted citations to rules and law in connection with any and all legal applications. In short, this Court was merely doing what Courts do when managing a long, and highly complex trial.

Finally, Curry completely mischaracterizes this Court's statements regarding Mr. Plaisted's handling of the listening-post/prosecutorial misconduct issues in an effort to argue that he was an ineffective counsel. The Government sought to introduce the testimony of a correctional officer who had overheard Curry and his co-defendant, Rakim Baskerville, planning to kill the cooperating witness, Lachoy Walker, the morning of the second day of Walker's testimony. The "listening post" case law clearly established that this conversation was properly overheard by the correctional officer. This Court's statements denying Mr. Plaisted's motion, and stating that he had submitted no case law does not show ineffectiveness. Rather, it shows that Mr. Plaisted's zealous effort to exclude the testimony was not supported by established law. Mr. Plaisted was not ineffective; this Court rejected certain arguments to exclude that evidence. Indeed, in the quote Curry cites, this Court specifically commended Mr. Plaisted's argument as "zealous advocacy." And because this Court ultimately decided in Mr. Plaisted's favor and excluded this evidence, Curry cannot establish that Mr. Plaisted was ineffective or that Curry

### iii.     Counsel's Alleged Failure To Adequately Advise Petitioner Of His Right To Testify

Petitioner claims that counsel was constitutionally ineffective because he coerced Petitioner into giving up his right to testify and failed to adequately discuss with and advise Petitioner regarding his right to testify.

A defendant has a constitutional right to testify on his own behalf at trial.  *Rock v. Arkansas*, 483 U.S. 44, 51-52 (1987).  Counsel has a duty to advise a defendant that he has a right to testify or not testify, the strategic implications of each choice, and that it is ultimately for defendant himself to decide.  *United States v. Teague*, 953 F.2d 1525, 1533 (11th Cir.), cert. denied, 506 U.S. 842 (1992); 1 ABA Standards for Criminal Justice Standard 4-5.2(a) (2d ed. 1980) (the decision regarding whether to testify is to be made by defendant).  There is a presumption that counsel and defendant have discussed defendant's right to testify and the advantages and disadvantages of doing so.  *United States v Pennycooke*, 65 F.3d 9, 12 (3d Cir. 1995).  Without evidence suggesting otherwise, defendant is presumed to have voluntarily waived his right to testify.  *Id.*  Where a record for such a waiver is to be made, the burden primarily falls upon defense counsel, because "as a general matter, we believe that it is inadvisable for a court to question a defendant directly about his or her waiver of the right to testify."  *Pennycooke*, 65 F.3d at 11.  "An effective waiver or relinquishment of a constitutional right must be made intelligently, voluntarily and knowingly."  *Foster v. Delo*, 11 F.3d 1451, 1457 (8th Cir. 1993).

---

was prejudiced.  In short, none of this Court's statements support Curry's claim that Mr. Plaisted was ineffective.

### a. Counsel's Advice To Curry Regarding His Right To Testify or Not Testify

Curry acknowledges that trial counsel "generally spoke of the potential for Petitioner to testify," but now complains that counsel never "specifically discussed with Petitioner the strategic implications of that choice, and never informed Petitioner that the decision was his, and his alone, to make." Petitioner further maintains that "counsel disregarded Petitioner's repeated insistence throughout trial that he wanted to testify, and went ahead and forced Petitioner into agreeing not to testify on the record in an attempt to avoid the appeal."

The record clearly shows that Mr. Plaisted and Curry discussed Curry's right to testify for more than two weeks; that Mr. Plaisted and Curry discussed different aspects of the issue as the trial went on; that Mr. Plaisted recommended to Curry that Curry not testify; and that Curry decided to follow counsel's advice and not testify. The record also demonstrates that Curry was informed that it was his decision alone whether or not to testify, and that he could reject Mr. Plaisted's recommendation. Curry's current claim that he did not understand that he could have rejected Mr. Plaisted's advice is directly contrary to the record. Rather, the record demonstrates that Curry clearly knew that he could accept or reject Mr. Plaisted's advice on whether or not to testify; Mr. Plaisted made it clear to Curry that he could accept or reject Mr. Plaisted's advice; and Mr. Plaisted represented to this Court that Curry understood that he could accept or reject Mr. Plaisted's advice.

Curry's statement after this colloquy "I don't understand,"[14] does nothing to change this

---

[14] While Curry makes much of his statement, the full record of that conversation thoroughly disproves his coercion theory. When Curry made this statement he had already been informed of his rights, including that he could reject Mr. Plaisted's advice on whether or not to testify. During that statement Curry said, "I just want the record to be clear, Judge, I can't make all the decision, but what I made, because I been here, I don't have an appeal lawyer here, nothing, I'm

fact.  After Curry's statement, Mr. Plaisted said "wait a minute. Your honor," and then consulted with Curry while this Court inquired of co-counsel Mr. Archie about whether his client, Mr. Baskerville, understood that he could accept or reject Mr. Archie's advice regarding whether or not to testify.

After Mr. Plaisted had consulted with Curry, this Court further inquired of Mr. Plaisted. Mr. Plaisted replied, "the record should be clear I've discussed it with Mr. Curry, I've advised him in – in my view it is best for the case for him not to testify . . . he has agreed to accept my advice and I mean that reflects what it is."  Any questions Curry earlier claimed to have regarding this issue was cleared up when he consulted again in Court with Mr. Plaisted after his claim of confusion, and when Mr. Plaisted clarified that Curry had again consulted with him and that his decision remained the same - - that he chose not to testify.

At the conclusion of all of the colloquies on the subject, and after hearing and observing defendant throughout the years of pretrial and trial proceedings, this Court found that Curry fully understood his rights.  And chose to follow Mr. Plaisted's advice not to testify.  This Court presided over this case for many years and had the opportunity to observe and listen to the defendant interact with his counsel and his co-conspirator/co-defendant.  This Court wrote at the time about their relationships and the defendant's strategic efforts to control the outcome of his

---

just making – made what my lawyer told me and it's my best decision not to testify. I just want to make that clear to you."

Curry claims his reference to an appeals lawyer demonstrates his confusion, but it shows just the opposite.  That Curry was considering the appellate ramifications of making a record of his waiver of his right to testify shows an advanced understanding of not only the issue, but also the criminal justice system in general.  Curry was at all times smart, knowledgeable and cunning about his legal rights.  He understood that if he could create confusion in the record he would have a better chance of creating an appellate issue.  This also explains his reluctance to go along with Mr. Plaisted's attempts to make a clear record on this issue.

trial.  *United States v. Curry*, Crim. No. 04-280 (D.N.J. Feb. 13, 2007).

Petitioner now faults this Court for not explaining his rights "to him on the record" or "ask[ing] directly and pointedly if he understood it was his right, and only his right, as to whether or not to testify."  Of course, this Court followed *Pennycooke* in addressing the issue.  In addition, this Court confirmed with Curry that Mr. Plaisted had "explained to you all the rights you have and you understand them and have no other questions[for Mr. Plaisted]."  Curry replied, "Yes. I'm just following his advice."  The first part of the answer is clear: "Yes [Plaisted explained to me all of my rights, I understand them, and I have no other questions]."  The second part of the answer is equally clear: "I'm just following [my lawyer's] advice."  Curry now contends that he involuntarily waived his right to testify because his lawyer forced him to do so.[15]  Nothing in the foregoing record supports this contention.  When Curry said he was "following his [lawyer's] advice," he demonstrated that he understood both that his lawyer's role was to advise him, and that he chose to follow his lawyer's advice.[16]

---

[15] Curry claims that Mr. Plaisted's statements, which indicated that Mr. Plaisted believed it was in Curry's best interest not to testify, show that Mr. Plaisted coerced Curry into not testifying. However, those statements show nothing more than that Mr. Plaisted advised Curry about what Mr. Plaisted thought was the best defense strategy ("If I am able to persuade him he should not testify, which is my view, I'd just like the fact . . . that I have talked with him at length about it and he has agreed, you know, with that decision").  Similarly, that Mr. Plaisted wanted Curry to "agree on the record" with Mr. Plaisted's advice not to testify, does not indicate coercion, but rather that Mr. Plaisted wanted the record to be clear that Curry was choosing not to testify at trial.  Mr. Plaisted had heard the defendant's comments about his "appeal lawyer" and he wanted a clear record of his client's waiver.

[16] Curry's quotations ignore the context of these conversations, which was that counsel was properly making a record of Curry's decision not to testify without running afoul of the admonition in *Pennycooke* that a court should not question a defendant directly about his waiver of his right to testify.  The complete record of the waiver belies Curry's new claim of coercion: Curry was present and participated in multiple colloquies on this issue, he never suggested, in his words or his demeanor that Mr. Plaisted had forced him to give up his right to testify.  *Cf. Ortega v. O'Leary*, 843 F.2d 258, 260 (7th Cir. 1988) (defendant repeatedly interrupted the trial to

While Petitioner cites Mr. Plaisted's statements "it is my decision, I have done it." and "I'm you know deciding," to now argue that Mr. Plaisted made the decision that Curry should not testify, the context of these statements makes it clear that Mr. Plaisted is referring to the procedure by which he intends to make a record, consistent with *Pennycooke*, of Curry's decision to waive his right to testify.  These statements do not refer to Curry's decision to waive his right to testify, but rather to Mr. Plaisted's determination of how to best make a record of Curry's decision.  Similarly, Mr. Plaisted's statement that Curry "reluctantly agreed to go through this because I told him I wanted to go through it," reflects that Curry was reluctant to agree to Mr. Plaisted's proposed procedure for making a record consistent with *Pennycooke*. Curry was reluctant to make a clear record about his choice not to testify because he was already thinking about issues for his appellate counsel.

This Court was very careful at the time to observe the defendant interact with his trial team.  His actions demonstrated intelligence and cunning in his efforts to control his trial, and his appellate rights.  And this Court's contemporaneous statement shows the great care taken with this issue:  "I did go back and review the transcript and am satisfied that the volunteered statement of Mr. Curry is a statement that he has made the best decision he knows how to make at this time with respect to, as to whether to testify or not to testify, and that he understands his rights."

### b.  Petitioner Suffered No Prejudice

It is clear beyond peradventure that the defendant was not prejudiced by the decision not

---

express his desire to testify and said his counsel was lying when counsel told trial court that he and defendant made a joint decision that defendant would not testify).

to testify.  If he had testified at trial, all of the wiretap evidence to which he was a party would have become admissible to cross-examine Curry, regardless of whether or not it was untimely sealed.  *United States v. Quintero*, 38 F.3d 1317, 1333 (3d Cir. 1994).  As a result, thousands of wiretapped calls that were otherwise inadmissible as a result of the Government's self-suppression decision could have been used to impeach Curry.  Wiretap evidence not only directly implicated Curry in drug trafficking and money laundering, but also in the attempted murder of Derrick Berrian.  That evidence also corroborated other aspects of Walker's testimony, including attorney Paul Bergrin's position as house counsel loyal to Curry.  Violence controlled Curry's drug organization, and innumerable violent acts that were not used in the case-in-chief would have become fair game for impeachment.  And they would have been chilling in their extreme nature.  In short, Curry's testimony would have assisted the Government's case tremendously.

### iv.  Counsel's Alleged Failure To Call Or Investigate The Possibility Of Calling Critical Witnesses

Curry now argues that Mr. Plaisted prevented him from calling ten additional witnesses, and that Mr. Plaisted failed to adequately investigate certain witnesses.  The Government counters that this is the first time and many years after trial that Petitioner has raised this argument, and that the record contradicts this new claim.  With nothing in the trial record to support this contention, the defendant now submits a series of affidavits many years after trial, purporting to detail facts to which certain persons would have testified at trial.  The Government argues that, regardless of whether these affidavits could survive scrutiny, reasonable trial counsel would not have called these witnesses and testimony from these witnesses would not have changed the outcome of the trial.

24

### a. There Has Been No Showing that Counsel was Ineffective on this Issue of these Additional Witnesses

First, the defendant cites nothing in the voluminous record to even suggest that he informed Mr. Plaisted about eight of the "additional witnesses." There is no mention of any of these persons in the trial record. There is nothing in any of Curry's affidavits now stating that he informed Mr. Plaisted of these eight additional witnesses. Thus, the pivotal allegation is unsupported.

Second, there is no mention or suggestion anywhere in the trial record that Curry wanted to call any witnesses other than those called at trial. While the trial record does disclose that Curry's defense team investigated and considered calling Laterra Howard-Lowe, nothing remotely suggests that Mr. Plaisted prevented Curry from calling her as a witness. And the trial record is utterly silent regarding the remaining nine alleged witnesses.

The claim of ineffective assistance on this ground is reed thin: It consists of Mr. Plaisted's general statements prior to the defense case that there were an undisclosed number of persons Curry thought should be witnesses; that at that time Mr. Plaisted's views differed from Curry's regarding who should be called; and that Mr. Plaisted was going to meet with Curry to advise him on the subject. However, the record further establishes that Mr. Plaisted subsequently met with Curry, that he investigated at least fifteen witnesses,[17] and that he ultimately called ten witnesses in the defense case. There is no support for the contention that Mr. Plaisted failed to investigate any of the persons Curry thought "should be witnesses" six years ago.

---

[17] These fifteen witnesses include the ten trial witnesses, plus Atif Amin, Rasheed Pryor, Curry's mother, Lowe and Suber.

Mr. Plaisted's statements that Curry had "a number of people . . . that he thinks should be witnesses," that Mr. Plaisted "had views in terms of them [the witnesses] that differ from his [Curry's] and so I've got to meet with him [Curry]," show Mr. Plaisted acting properly and carefully as his defense counsel. The colloquy demonstrates that trial counsel was making diligent efforts to analyze the benefits and drawbacks of calling the witnesses Curry was considering calling to testify in the defense case. The colloquy shows that Curry and Mr. Plaisted initially had a difference of opinion about whether to call certain witnesses, and that Mr. Plaisted was going to meet with and advise Curry regarding the final defense strategy as it related to those witnesses. A disagreement between counsel and client over a matter of trial strategy is not grounds for a finding of constitutional ineffectiveness. *United States v. Ambort*, 28 F. App'x 714, 717 (10th Cir. 2008). *See also United States v. Lively*, 817 F.Supp. 453, 462 (D. Del. 1993) (disagreement with counsel's trial strategy is not in itself sufficient to support a charge of inadequate representation). There is nothing in the record to support the new contention that Mr. Plaisted's view prevailed over Curry's view. Indeed, the record indicates the opposite, as Mr. Plaisted did decide to call ten witnesses in the defense case. That Mr. Plaisted said "maybe my view will prevail and it will be a short defense case," demonstrates it was Curry, and not Mr. Plaisted, who had final say on whether or not a particular witness was called to testify.

Moreover, when the defendant wanted a witness to testify, Mr. Plaisted went to great lengths to accommodate Curry's wishes. For example, during the trial, Curry wanted to call co-conspirator Atif Amin as a witness. This Court assisted Mr. Plaisted in having Amin produced in court to testify. Amin was represented by counsel. Amin's counsel did not want Mr. Plaisted to speak to Amin in his absence, or call Amin as a witness, and informed this Court of this fact.

26

Even though Amin's counsel wanted to be present for any interview of Amin, Mr. Plaisted nonetheless spoke to Amin because Curry had instructed him to do so.  Curry was clearly in control of his defense. When Amin invoked his Fifth Amendment right and refused to testify, Mr. Plaisted unsuccessfully moved to have Amin granted immunity and forced to testify.  That Mr. Plaisted went to such lengths to accede to Curry's wishes, demonstrates that Curry was directing defense strategy.

Similarly, immediately prior to the close of the defense case, Mr. Plaisted stated, "Mr. Curry just reminded [me]. We wanted to call his mother."  Although the defense later decided not to call Curry's mother as a witness, this further demonstrates Curry had direct control over who was called as a witness.  It is very difficult to believe that Curry would have reminded Mr. Plaisted to call his mother as a witness, but say nothing about the ten other witnesses he now claims he wanted to call at trial.

The record belies Curry's assertion that he "fought to have the above [ten] witnesses testify at trial and was overruled by counsel."  The affidavits Curry submits six years after trial do nothing to change the trial record.  Indeed, none of the affidavits even alleges that Mr. Plaisted prevented Curry from calling any of the ten witnesses.[18]

In short, the current claim that counsel was ineffective with regard to investigating and calling defense witnesses is factually deficient.  It is also legally meritless.  Counsel's strategy in

---

[18]  Similarly, Mr. Plaisted's statement that "maybe my view will prevail and it will be a short defense case" does not suggest that Mr. Plaisted refused to properly investigate, but rather that he believed a short defense case was the best strategy.  Curry's spin on this statement is further belied by the fact that Mr. Plaisted investigated at least fifteen witnesses, that Mr. Plaisted put on testimony of ten witnesses, and that he prepared and introduced numerous exhibits, including transcripts, in the defense case.

this regard "is precisely the sort of strategic trial decision that Strickland protects from second

guessing." *Henderson v. DiGuglielmo*, 138 Fed. Appx 463, 469 (3d Cir. 2005).[19]

---

[19]  In addition to the insurmountable hearsay issues, much of the purported testimony is character
witness testimony.  That testimony not only would have had minimal value for Curry, but it also
would have opened the door to cross-examination about, and possibly the introduction of
additional evidence of, Curry's bad character.  *See* Fed. R. Evid. 405(a) (specific instances of
defendant's misconduct may be inquired into on cross-examination of character witnesses); *see
also United States v. Kellogg*, 510 F.3d 188, 196 (3d Cir. 2007) (Government may put guilt-
assuming hypotheticals to character witnesses).  Deciding not to call such witnesses does not
make Mr. Plaisted deficient. *See United States v DeJesus*, 57 F. App'x 474, 478 (2d Cir. 2003)
(trial counsel's decision not to call a character witness was grounded in a strategy of preventing
the prosecution from attacking defendant's character and therefore was "inherently tactical,"
"generally should not be disturbed," and was not "objectively unreasonable" under *Strickland*).

Similarly, many of the other witnesses had criminal records, were charged co-defendants,
or unindicted co-conspirators in the charged crime.  As such they would have been subject to
withering cross-examination likely damaging to Curry, even had they waived their Fifth
Amendment right and testified.  In some instances, these witnesses actually had given prior
under oath statements inculpating Curry in the charged crime. "Counsel cannot be deemed
ineffective for failing to call a witness where there is good reason to question the witness's
credibility and the witness would be vulnerable to cross examination on damaging evidence."
*United States v. Napoli*, Civ. No. 11-6353, 2012 WL 4459584, at *6 (E.D. Pa Sept. 26, 2012),
(citing *McAleese v. Mazurkiewicz*, 1 F.3d 159, 167-70 (3d. Cir. 1993)).  The following witnesses
had their issues, to put it mildly.

If Cathy McLean had testified as a general character witness, much of the information
attributed to her in the investigator's affidavit would have been inadmissible at trial.  Any
specific act for which she was not a first-hand witness almost certainly would have been
excluded.  Additionally, she would have been precluded from recounting statements made to her
by others, including Curry, because such statements would be inadmissible hearsay.  Fed. R.
Evid. 802.  In short, the only thing she would have been able to testify about is her opinion of
Curry's character.

There are many reasons why competent counsel would not have called McLean to testify:
Curry's wife had already established many of the facts attributed to McLean in the post-hoc
affidavit.  Putting on multiple witnesses risks the possibility of inconsistencies.  Second, as a
character witness, she would have been subject to cross-examination about whether her opinion
would have changed had she been aware of the myriad criminal acts that Curry had committed,
charged and uncharged, which once again would remind the jury of those acts.  Had she testified
she was aware of the criminal acts, her testimony would have bolstered the prosecution's case.  If
she testified she was unaware of the criminal acts, then her assessment of Curry's character
would be called into question.  In addition, her testimony would have placed Curry's character in
issue thus opening the door to questioning about specific instances of misconduct, such as
potential cross-examination about Curry's involvement in murdering Kemo Deshawn McCray.
See Federal Rule of Evidence 405(a).  Given the small potential upside and the enormous

potential downside, it would have been reasonable for Mr. Plaisted to conclude that McLean should not be called as a witness.

Latesha Telfair was a potential co-conspirator, and likely would have invoked her Fifth Amendment rights. If that hurdle had been overcome, none of her testimony would have rebutted any of the specific criminal acts proven in the Government's case. Her statements, if believed, would have established that Curry gave her money, and that he took their son over the weekend.

In light of the mountains of evidence to the contrary, Telfair would not have established Curry was too busy being a good father to be a drug dealer. As for the "crucial testimony" that Curry told her he wanted to move to North Carolina, that almost certainly would have been precluded as inadmissible hearsay; and would have been inconsistent with Curry's wife's testimony, (who claimed that she and Curry were looking to move to South Jersey or Warren County New Jersey); and barely relevant, if at all. Since Telfair was aware of his drug-trafficking activity, and would have been cross-examined on it, corroborating Walker's testimony about Curry's early days as a drug dealer. Moreover, since Curry was convicted on May 3, 2002 of assaulting a police officer on August 13, 2001, well after the birth of their son, her claim about Curry's transformation after the birth of his son would have been seriously tested. Similarly, her potential testimony about Curry's post-birth-of-son transformation from drug dealer to father would have been inconsistent with Curry's wife's testimony that it was her ultimatum in 1999, not the birth of Curry's son in 1996 that triggered Curry's alleged transformation. Her testimony would have placed Curry's character in issue thus opening the door to very damaging cross-examination about Curry's violent acts. See Fed. R. Evid. 405(a). Considering the small potential upside and the enormous potential downside, competent counsel would not have called Telfair as a witness.

There are numerous reasons why competent counsel would not call Omar Currie as a witness. Omar Currie at most would also have been permitted a cumulative character witness with the same risks as the others listed above. His testimony would not have rebutted any of the specific evidence of drug trafficking proven by the Government at trial.

Mr. Plaisted interviewed Aquila Suber, and there are many reasons why competent counsel would not have called her to the stand. First, Suber's statement that Walker asked her to rent the dungeon and that Walker paid the rent and utilities is consistent with Walker's testimony and the Government's case. Walker testified that one of the things he did for Curry was obtain stash houses for the Curry Organization. Indeed, Walker's testimony and intercepted calls introduced at trial demonstrated that Curry wanted to get "a new dungeon [stash house]" because he feared too many people knew the location of the dungeon. The calls also show that thereafter, Curry asked Walker to assist him with finding a new dungeon. It is completely consistent with the Government's evidence that Curry would have put his drug stash house in a co-conspirator's girlfriend's name.

It is easy to see why competent counsel would not call Jason Hannibal as a witness. In his sworn factual allocution during his guilty plea hearing, Hannibal fully inculpated Curry in the drug conspiracy for which Curry was on trial. Hannibal's affidavit, six-years-after-the-fact, which contradicts his sworn plea allocution, could subject him to prosecution for perjury. But even if Hannibal did testify, the Government would have been able to cross-examine him with his prior sworn statement in which he inculpated Curry. In addition to impugning Hannibal's credibility, that prior statement would have become affirmative evidence of Curry's guilt under

Federal Rule of Evidence 801(d)(1).  Even inexperienced counsel would understand the tremendous downside of calling Hannibal to testify for the defense.

Hannibal was a convicted, but not yet sentenced, member of the conspiracy for which Curry was on trial.  Hannibal thus had a Fifth Amendment right against self-incrimination; Hannibal was represented by counsel, who would have had to advise him with respect to such rights.  Mr. Plaisted had unsuccessfully attempted to call two other convicted-but-not-yet-sentenced co-conspirators during trial at Curry's behest; Curry's after-the-fact claim that Mr. Plaisted was ineffective for not calling Hannibal as a defense witness rings particularly hollow.  Given that Hannibal was a co-conspirator who had inculpated Curry under oath, his testimony would not have impacted the outcome of the trial.

The majority of the information in the Shanette Alexander affidavit recounts hearsay statements purportedly made by Ishmael Pray to her.  Moreover, Alexander's assertion that Government lawyers approached Pray to testify against Curry because the Government lawyers approached "did not think Poo Walker was being truthful," has many layers of hearsay.  Finally, it would boomerang even if the hearsay problem could be overcome because Pray himself inculpated Curry in his sworn factual allocution during his guilty plea hearing.  Given that Pray and Walker both implicated Curry, Alexander's hearsay testimony that Government lawyers wanted to call Pray because they thought Walker was lying is nonsensical, because they were both saying the same thing about Curry's drug-dealing enterprise.  More significantly, the only way to get beyond the hearsay problem, if at all, would have been through Pray's testimony, not Alexander's.  Yet Pray had already inculpated Curry in the charges for which he was on trial.  In addition to impugning Pray's credibility, that prior statement could have become affirmative evidence of Curry's guilt under Federal Rule of Evidence 801(d)(1).  Competent counsel would not have called Alexander as a witness, because she had no admissible evidence to offer and the downsides exceeded the upsides.

Curry claims that Mr. Plaisted should have called Madison and Gordon to support a defense that he had legitimately obtained the money to support his lavish lifestyle.  There are many reasons why competent counsel would not have called these witnesses to the stand.

The testimony of Madison and Gordon, at most, would have supported Curry's alternative explanation for his lavish lifestyle/unexplained income.  While some evidence was introduced to show Curry's unexplained income, the crux of the Government's case was the overwhelming evidence of Curry's direct role as the top man in a sophisticated drug trafficking organization.  Even if their testimony could rebut the inference created by unexplained income, it would have done nothing to rebut the overwhelming direct evidence of Curry's drug trafficking.  It would also have been cumulative of the testimony of Curry's wife and Tahirou Ndiaye that the money came from selling clothing and promoting parties.  However, their testimony also had a risk in that it would have contradicted Mrs. Curry's testimony that they were struggling financially.  Financial struggles were key to Curry's defense, particularly to the money laundering charges, and thus a decision not to call these witnesses was a reasonable strategy.

Moreover, while Madison might testify that he and Curry made $360,000 per night as party promoters, no financial records of such a lucrative business are proffered.  Contrary to Curry's contention that their testimony would have supported his defense, it actually would have undercut his defense that he was struggling financially.  And it was not so much his lavish lifestyle, but rather the manner in which he conducted his financial and business transactions that proved most damaging.  These purported witnesses would highlight that damaging evidence,

The record demonstrates that Mr. Plaisted more than adequately investigated this case.[20] Mr. Plaisted did a tremendous amount of investigation in this case, filing scores of motions, including motions for virtually every trial day, investigating to prepare for the cross-examination of each of the Government's witnesses, investigating at least 15 defense witnesses, investigating to prepare and present numerous defense exhibits.  Mr. Plaisted also hired a private investigator to assist him in investigating the case.[21]

---

e.g., despite allegedly making $360,000 per night, Curry never filed income tax returns; Curry did not have a bank account; had no records of the business transactions that generated this vast wealth; purchased expensive vehicles using straw-purchasers rather than in his own name; used cellphones listed to persons other than himself to conduct his business; drove cars rented in other persons names when conducting business; and drove vehicles with hidden compartments.  A person with a legitimate source of income, conducting legitimate business would not act in this a manner.  Madison's and Gordon's claims about the vast sums of money Curry was earning would have completely undercut Curry's explanation of the luxury car transactions that were the subject of the money laundering charges.

[20]  Diligent counsel may draw the line when they have good reason to think further investigation would be unproductive.  *Rompilla v. Beard*, 545 U.S. 374, 383 (2005).  Defense counsel is not required to investigate everyone whose name happens to be mentioned by the defendant.  *Nealy v. Cabana*, 764 F.2d 1173, 1178 (5th Cir. 1985).  "In reviewing counsel's decision not to investigate, the court must apply a heavy measure of deference to counsel's judgments."  *Sullivan v. Fairman*, 819 F.2d 1382, 1391 (7th Cir. 1987).  In order to show Mr. Plaisted was deficient, Curry must show that any witness testimony obtained from the investigation that Mr. Plaisted allegedly failed to perform would have been favorable and material.  *Lewis v. Mazurkiewicz*, 915 F.2d 106, 115 (3d Cir. 1990).  That he cannot do.

[21]  The instant case is not even remotely like cases cited in which counsel's investigation was found deficient.  *See United States v. Gray*, 878 F.2d 702, 712-13 (3d Cir. 1989) (counsel's complete abdication of the duty to investigate at least four eyewitnesses who could have supported defense claim that gun belonged to someone else fell below minimum standard of reasonable professional representation);  *Sullivan*, 819 F.2d at 1391- 92 (perfunctory attempts to contact identified and available eyewitnesses who directly contradicted the prosecution's primary witnesses' version of the shooting was deficient); *Code v. Montgomery*, 799 F.2d 1481, 1483-84 (11th Cir. 1986) (where defense was alibi, counsel's complete failure to interview and otherwise investigate alibi witnesses was deficient); *Nealy*, 764 F.2d at 1179-81 (counsel was deficient for complete failure to interview identified witnesses who would have provided alibi, corroborated defendant's testimony that he was not involved in the charged crime, and cast doubt upon the prosecution's primary witness's version of events); *United States v. Debango*, 780 F.2d 81, 85 (D.C. Cir. 1986) (counsel was deficient for failing to interview identified witness who would

While most of the individual purported witnesses are discussed in the footnotes, two of them exemplify the careful thought processes that defense counsel would have had to engage in before calling these potential witnesses:  Mr. Plaisted interviewed Laterra Howard Lowe, revealing the many reasons why competent counsel would not have called her to the stand. Much of the information in the affidavit would have corroborated the Government's evidence that Curry organized and engaged in expensive trips with persons who were his drug co-conspirators, a fact that the defense contested at trial.  Indeed, the only relevant testimony Lowe could have provided that even marginally was helpful to Curry was that she believed "each individual paid for their own tickets because her late husband was sometimes the man who had collected the money from everyone for the trip."  Her basis of knowledge on this subject rests on hearsay statements of her late husband.  Even if Lowe could have provided some helpful testimony, there would have been an *enormous* downside to calling her.  First, she would have corroborated the Government's evidence on a contested issue about luxury travel.  Second, as discussed at length during trial, her testimony would have opened a goldmine of cross-examination material for the Government, including, her late husband's position as a top lieutenant in the Curry drug trafficking organization, her close personal friendship with Mrs. Curry, and her own potential legal exposure for booking deluxe travel paid for with drug money.[22]  Third, although the affidavit claims she would have testified, with potential legal

---

have corroborated crucial claim in defendant's testimony that Government informant asked defendant to participate in the Crime Solvers Program); *Crisp v. Duckworth*, 743 F.2d 580, 583 (7th Cir. 1984) (counsel was deficient for: complete failure to investigate eyewitnesses to the murder, witnesses supporting self-defense claim, other witnesses that corroborated defense; failure to visit the crime scene which allowed a potentially erroneous diagram to be entered into evidence by the prosecution; and failure to adequately prepare defendant for his testimony).

[22]  Mr. Plaisted sought a preliminary opinion from this Court precluding the Government from cross-examining Lowe about these topics but this Court correctly explained that it would rule on his requests once he had a proper idea of what cross-examination questions would be proposed,

exposure Lowe would have likely needed independent legal counsel to assist her in deciding whether or not to invoke her Fifth Amendment rights.  In short, it is more than reasonable to conclude that the potential upside of calling Lowe was outweighed by the potential downside of calling her.  Most importantly, she would not have rebutted any of the specific drug trafficking acts proved in the Government's case, and her testimony would not have impacted the outcome of the trial.  The other witnesses, detailed in footnote 19, had similar issues.

Similarly, Curry now claims that Raheem Webb would have testified that his family, not Curry, paid for his legal representation, and that Mr. Plaisted was an ineffective attorney for not calling Webb as a defense witness.  Given that Webb was not a first-hand witness to the payment to attorney Vincent Nuzzi, his testimony would likely be hearsay.  And the usefulness of this testimony is demonstrably undermined by the wiretap interceptions in which Curry explicitly directed a co-conspirator to pay for Webb's legal representation.  Mr. Plaisted elicited the same testimony from Mr. Nuzzi during the defense case that Curry now claims Webb would have provided.  Bank records were introduced through Mr. Nuzzi of the payment Mr. Nuzzi received in connection with representing Webb.  That Mr. Plaisted decided to call a lawyer, rather than a convicted co-conspirator of Curry, to establish these facts is another example of the competence, professionalism and good judgment that Mr. Plaisted exercised throughout the trial.  In short, it was entirely reasonable for Mr. Plaisted not to call Webb as a defense witness.[23]

_____

to determine their relevance to her direct testimony and balance Rule 403 considerations.  This uncertainty no doubt informed the decision not to call Lowe.

[23]  It also would have been reasonable for Mr. Plaisted not to interview Webb.  Webb, as a co-conspirator would have also had a Fifth Amendment right against self-incrimination and thus could not have been forced to testify.  It is far from clear whether Webb would have agreed to testify.  Webb was represented by counsel, Mr. Nuzzi, on the related state charge, and Nuzzi worked closely with Plaisted.  Since Mr. Plaisted got exactly the same information from Mr.

### b. Prejudice Has Not Been Demonstrated

Curry cannot show prejudice from the decision not to call the enumerated defense witnesses.  With the exception of Hannibal, each affidavit is filled with double and triple hearsay allegations.  For that reason alone, the Court has the discretion to reject these affidavits.  *Neill v. Gibson*, 278 F.3d 1044, 1056 (10th Cir. 2001).

Even if Petitioner could overcome the first level of hearsay, from Curry's investigator to the purported witness him or herself, most of the witnesses' statements would not have been admissible because they are themselves hearsay statements that recount Curry's own prior self-serving statements, or hearsay statements of third parties, or recount facts for which the witness had no first-hand knowledge.  Only two of the ten affidavits state that the affiant would have agreed to testify, and most including both Lowe and Hannibal, faced serious Fifth Amendment privilege decisions had they been subpoenaed to testify.  Thus, it is entirely speculative whether any of such witnesses would have knowingly waived their Fifth Amendment rights and testified at trial.  Most significant, the defendant cannot show a reasonable probability that he would have been acquitted if these witnesses had testified.  *Lewis v. Mazuriewicz*, 915 F.2d 106, 115 (3d Cir. 1990).

As the lengthy footnote 19 makes clear, much of the evidence would have been excluded as hearsay, much would have been cumulative character evidence with a downside risk far greater than the value of the testimony, and none rebutted the overwhelming direct evidence of major violent drug trafficking.  *See Dejesus*, 57 F. App'x at 478 (no prejudice where counsel fails to call character witness).  Since their testimony also would have opened the door to

---

Nuzzi that he would have gotten from Webb, there was no reason for Mr. Plaisted to interview Webb.

additional rebuttal evidence of Curry's criminal activity, possibly including evidence of additional murders that was otherwise withheld from the jury, the net impact would have been harmful to Curry.

None of these witnesses, alone or in combination, no matter how loyal to Curry, would have been able to make a dent in overcome the overwhelming evidence presented in this case. *See Debango*, 780 F.2d at 85 (even though counsel was constitutionally deficient, prejudice could not be established because of the overwhelming evidence of guilt); *Crisp*, 743 F.2d at 588 (same).

**v.      Counsel's Alleged Failure To Conduct Effective Cross-Examination Of Key Witnesses**

Curry next argues that he was denied the effective assistance of trial counsel because counsel's cross-examination of witnesses, particularly Walker and Special Agent Gregory Hilton, was ineffective.

The Sixth Amendment guarantees an opportunity for defendant to conduct cross-examination in order to confront the witnesses against him. *See U.S. v. Owens*, 484 U.S. 554 (1988). The Confrontation Clause provides protection for a criminal defendant, including the right to confront the witnesses against him. *Pennsylvania v. Ritchie*, 480 U.S. 39 (1987). Cross-examination is the principal means by which the believability of a witness and the truth of the testimony are tested. *Davis v. Alaska*, 415 U.S. 308, 316 (1974). "Decisions regarding cross examination, including the extent and manner, are generally considered strategic in nature and will not support an ineffective assistance of counsel claim." *United States v. Bellinger*, No. 09-4555, 2010 WL 3364335, at *5 (E.D. Pa. Aug. 24, 2010); s*ee also Nguyen v. Grace*, 245 F. App'x, 130, 131 (3d Cir. 2007) (when the lawyer is confronted with the choice between an aggressive cross-examination and a succinct one, the courts should defer to counsel's decision).

### a. Counsel's Cross-Examination Of Key Witnesses Was Effective

The Petitioner concedes that Mr. Plaisted attacked Walker's credibility through the most obvious means, e.g., pointing to the benefits Walker received for testifying. Presumably this concession also refers to Mr. Plaisted's thorough cross-examination about Walker's criminal history. Based upon these concessions alone, Mr. Plaisted's cross-examination met the standards of competency. *See Marrero v. Lamas*, Civ. No. 11-6707, 2012 WL 2938438, at *8 (E.D. Pa. July 19, 2012) (petitioner cannot show counsel's cross-examination ineffective where such cross-examination highlighted witness's criminal background, his probationary status at the time he made his statement to police, and specifically raising that point that perhaps witness had hoped for something in return for his statement to police).

Mr. Plaisted's advocacy actually went well beyond the standard required. For example, Mr. Plaisted cross-examined Walker about: both Walker's criminal conviction record and Walker's uncharged criminal activity; allegations that Walker, and not Curry, participated in the murder of Darnell "Buck" Anderson;[24] the Government's agreement not to charge Walker with all of the drugs for which he could have been held responsible; the further benefit of a reduction in sentence on the lesser charges Walker expected to receive in exchange for his testimony; other benefits Walker expected to receive from the Government in exchange for his testimony; Walker's incentive to fabricate his testimony about Curry because Walker was trying to benefit financially by writing a book about his experiences; and the multiple times Walker met with the Government to prepare his testimony. Moreover, Mr. Plaisted elicited testimony supporting his

---

[24] Walker testified that Curry was involved in murdering Buck Anderson.

contention that Pray, not Curry, was the head of the drug gang.  Mr. Plaisted's cross-examination of Walker was organized, nuanced, tough, well prepared, and based upon cogent strategy.

Nevertheless, Curry claims that Mr. Plaisted was ineffective on cross-examination because the jury believed Walker, e.g., Curry claims that "effective cross-examination of Walker had to cause the jury to question Walker's credibility."  This is not the standard to gauge whether a defendant received effective assistance of counsel.  An unfavorable trial verdict alone cannot establish an ineffective assistance of counsel claim.  *Brand v. Gillis*, 82 F. App'x 278, 282 (3d Cir. 2003).  As detailed below, the specific instances cited by Petitioner do not remotely demonstrate that Mr. Plaisted was ineffective.

    1.   Cross-Examination of Walker

Curry suggests that Mr. Plaisted should have asked Walker if Curry's monetary and social success bothered Walker.  An experienced lawyer, like Mr. Plaisted, would have obviously recognized that such a line of questioning would not be good for the defendant because it would be tantamount to an admission of Curry's unexplained wealth (including the luxury vehicles Curry claimed not to own in order to defend the money laundering charges). This line of cross-examination would have been inconsistent with the overall defense strategy which contested the Government's claim that Curry led a lavish lifestyle.  It was reasonable for Mr. Plaisted not to pursue this line of cross-examination.

Curry also now claims that he told Mr. Plaisted that "friends and family heard that Walker became enraged just days before his arrest because he suspected Curry was romantically involved with the mother of Walker's child."  Even if this were true, it would have been reasonable for Mr. Plaisted not to pursue this line of cross-examination.  Although Curry claims that Mr. Plaisted was ineffective for not substantiating this claim, his new investigators have not

located any witnesses to corroborate it.[25]  And given the volume of drugs, money and violence that permeated the evidence against the defendant, a dalliance with someone else's girlfriend would seem a minor issue by contrast.

Curry also claims that Mr. Plaisted should have confronted Walker with certain documents, namely, a non-existent NBA All Star game ticket, and the title to the Chevy Lumina that Curry gave to Walker.  This claim misrepresents the record; Walker testified that Curry attended various NBA All Star games and paid some of the expenses incurred, particularly the seats that cost Walker $300.  A ticket stub recovered on Curry with a listed price of $83 was not for that game, however; it was for a playoff game for the Philadelphia 76'ers.  Thus, the contention that counsel was ineffective for not trying to prove that Walker lied about the cost of an NBA All Star game ticket is absurd.

Similarly, given all of the evidence that Curry registered cars in the names of other people, cross-examination of Walker to try to prove that the title to the Chevy Lumina passed from Curry's brother to Walker's mother hardly demonstrates Walker lied when he testified that Curry gave him the car.  To dwell on this during cross-examination would have risked the obvious retort that the gang registered the cars they used in the names of other people so that they could avoid law enforcement scrutiny.  This would have hurt Curry, while any benefit would have been marginal at best.  Mr. Plaisted reasonably chose not to confront Walker regarding this information.

---

[25]  In addition, the specter that Curry had an extra-marital affair with his co-conspirator's ex-girlfriend, contradicts Curry's claim at trial that he had given up drug dealing to become a devoted family man.  That Mr. Plaisted failed to pursue this line of questioning does not make him ineffective.

Curry also claims that Mr. Plaisted was ineffective for not cross-examining Walker with the fact that co-conspirators Atif Amin and Pray grew up together in Georgia King Village. This allegation was discussed during trial.  It was a minor point at best, and described by this Court as follows: "while it is a tidbit, it's not core central or essential or even material, particularly to the charges in this case, how these people know each other."  Moreover, Mr. Plaisted's decision not to confront Walker with this allegation was reasonable in light of his belief that Amin would be willing to testify about it.  And had Mr. Plaisted confronted Walker directly, he would have given Walker the opportunity to explain away a relatively minor inconsistency.  *See Outten v. Kearney*, 464 F.3d 401, 414 (3d Cir. 2006) (reasonableness of counsel's actions must be viewed as of the time of counsel's conduct).

Mr. Plaisted's decision to ask about the benefits Walker expected to receive in the Witness Security Program was a reasonable strategic choice.  Indeed, during summation Mr. Plaisted argued that Walker had lied about Curry in part so he could start a new life away from inner-city Newark at the Government's expense.  Moreover, the potential negative impact of such questioning, i.e., that the Government placed Walker in the witness protection program because it had information that Curry was attempting to arrange to kill him, was greatly reduced because Mr. Plaisted knew the jury was going to hear evidence in the Government's case-in-chief about Curry's plot to kill Walker.[26]

_____

[26]  Under the circumstances, Mr. Plaisted made a reasonable decision that he would impugn Walker by eliciting more evidence of Government benefits to Walker, and attack the evidence that provided the basis for the Government's belief that Curry posed a threat to Walker, namely the testimony of Marion Yarborough.  Mr. Plaisted spent a great deal of effort discrediting Yarborough, not only vigorously cross-examining him, but also calling two witnesses to discredit him and the substance of his testimony.  Contrary to Curry's assertion, Mr. Plaisted's decision to ask Walker about the benefits of Witness Security Program did not open the door to the Yarborough testimony.  The Court ruled the Yarborough testimony admissible before trial began.  The reference to "opening the door" contained in the colloquy Curry cites relates to the murder

Petitioner claims that his drug organization's longtime counsel, Paul Bergrin, cross-examined Walker in an unrelated case more effectively than Mr. Plaisted's cross-examination of Walker because Bergrin was able to obtain a mistrial in that other case.[27] This logic is fundamentally flawed for many reasons.  First, it assumes, without any evidence, that Bergrin's cross-examination of Walker is what led to the mistrial.  Second, this contention compared apples to oranges.  In the trial, defended by Bergrin, Walker's relatively brief testimony was limited to a discrete Rule 404(b) issue, and the Government offered almost none of the corroborating evidence it introduced in the Curry trial.  In the Curry trial, by contrast, Walker was the primary witness, testifying for six days on a variety of topics, and the Government introduced substantial corroboration for Walker's testimony.  The situations are not comparable and the standard to gauge effectiveness of counsel does not rest in any way on a comparison of the different styles and means of different defense counsel.

### 2.  Alleged Deficiencies in the Cross-Examination of Special Agent Hilton

Petitioner cites instances in which Mr. Plaisted's cross-examination of Special Agent Hilton drew an objection that was sustained.  From this he concludes that the Government and this Court were negatively commenting on Mr. Plaisted's effectiveness in representing Curry.  This is an entirely incorrect inference.  Many rules of evidence provide a basis for objection, but the objection is waived if not timely made.  Therefore, it is not uncommon for counsel to ask a question and get his answer without objection.  Asking a question this way is not ineffective.  It

---

of Kemo Deshawn McCray. Since evidence of the Kemo Deshawn McCray murder was not admitted at trial, Mr. Plaisted's cross-examination about witness protection did not open the door to additional evidence.

[27] Mr. Bergrin later became a defendant himself.  *U.S. v. Bergrin*, ___ F. App'x ___, 2014 WL 7181499 (3d Cir. Dec. 18, 2014).

could actually be very effective.  Here, Petitioner points to questions posed by Plaisted that elicited an objection by the prosecution based on confusion.  Asking a question deemed confusing is hardly ineffective assistance by defense counsel cross-examining a Government witness.

Curry complains about another instance of Mr. Plaisted's cross-examination related to Liberty Travel Agency documents.  Mr. Plaisted was probing Special Agent Hilton's knowledge of facts contained in subpoenaed documents that had been the subject of direct examination.  Specifically, Mr. Plaisted attempted to establish through Special Agent Hilton that payment for a particular transaction could have been made in something other than cash.  That fact was beyond the scope of Special Agent Hilton's knowledge, so the Government objected.  The Court initially overruled the Government's objection, but sustained it when Special Agent Hilton's answer made it clear he had insufficient knowledge to answer the question.  It is hard to see how this could possibly be considered deficient performance.  Indeed, even though Mr. Plaisted was not able to establish all the facts he wanted through Special Agent Hilton, he was able to effectively establish that Hilton was unaware of facts related to records about which he had testified.  Curry also claims this Court chastised Mr. Plaisted for not following the evidence rules.[28]  But as set forth previously, that does not support Curry's claim of ineffectiveness.

---

[28]  During this portion of the cross-examination, Mr. Plaisted was attempting to impeach Special Agent Hilton with a report written by another agent that Special Agent Hilton had neither read nor adopted.  While doing this, Mr. Plaisted read aloud from the report, which was not in evidence.  The Government understandably objected that both the impeachment with another agent's report and Mr. Plaisted's reading the report aloud before the jury violated the rules of evidence.  This Court agreed with the Government and instructed Mr. Plaisted on how he could use reports to cross-examine witnesses.  With this line of questioning, Mr. Plaisted was trying to establish that the drugs found inside the stash house belonged to someone other than his client.  He first established that Tyheed Mitchell and William Lattimore, and not Curry, were staying at the stash house.  The report indicated that the drugs were found "on someone's dresser," thus implying that they belonged to one of the persons staying at the stash house, rather than Curry.

During another part of the cross-examination of Special Agent Hilton, Mr. Plaisted was attempting to authenticate wiretap recordings he intended to use as part of the defense case. Hilton was a proper witness to authenticate those recordings. It was initially unclear why Mr. Plaisted was laying this foundation on cross-examination, rather than calling Hilton on the defense case. So the Court said, "I am trying to find out what this had to do with the cross of this witness." When Mr. Plaisted explained his position, the Government stated it would not contest authenticity, and this Court told Mr. Plaisted he could introduce the tapes through Special Agent Hilton. Since the Government conceded authenticity, Mr. Plaisted ultimately decided to play the tapes during the defense case. Curry fails to explain, let alone prove, how this exchange shows ineffectiveness of Mr. Plaisted.

In another portion of Special Agent Hilton's cross, Mr. Plaisted was probing Special Agent Hilton's knowledge of Walker's arrest. It became clear from the questioning that Hilton had no first-hand knowledge of Walker's arrest. The Court simply clarified that Special Agent Hilton should answer Mr. Plaisted's questions based upon Special Agent Hilton's first-hand knowledge, and then asked Mr. Plaisted to "try your questions again." This kind of minor, routine trial matter has no place in a collateral attack on the effectiveness of trial counsel.

Mr. Plaisted then questioned Special Agent Hilton about: information that Walker worked for Pray (not Curry); Walker's criminal history; Walker's use of a vehicle to commit drug offenses; and whether Curry had ever been surveilled with Ashon Fisher, Eric Schuler, or a drug supplier known as Pretty Tony. All of these questions were designed to impugn Walker's

---

Since Special Agent Hilton did not know where the drugs were found, as he was not present for the search of the stash house, Mr. Plaisted tried to elicit the facts he wanted by showing Hilton the report and getting him to confirm those facts. When this drew an objection, Mr. Plaisted read the report aloud to the jury. While this practice may have been contrary to the rules of evidence, it certainly was designed to, and did, benefit Curry.

credibility or otherwise further the defense.  The first part highlighted the defense contention that Pray, not Curry, ran the drug organization.  The second part highlighted Walker's own criminal conduct.  The third part highlighted that DEA did not have corroboration for certain aspects of Walker's testimony.  The trial record in this case simply does not support any contention that Mr. Plaisted backed away and did not fully develop his arguments.

Mr. Plaisted then focused on one portion of a statement that he believed supported an inference that Walker framed Curry.  There was an issue regarding whether Curry had actually uttered a portion of a statement Mr. Plaisted wanted to highlight.  Although the Court concluded that Curry had not uttered the portion of the statement Mr. Plaisted wanted to highlight, Mr. Plaisted nonetheless asked Special Agent Hilton questions designed to establish that Curry in fact had made that portion of the statement that Mr. Plaisted believed was favorable to the defense.  In ruling against Mr. Plaisted, the Court noted that Mr. Plaisted had previously sought to exclude the statement.  While it is correct that Mr. Plaisted had unsuccessfully sought to exclude the entirety of the statement, his cross-examination tried to mitigate the import of the evidence by highlighting a portion of the statement he believed Curry had made and was favorable to the defense.  It was effective strategy.

### 3.  Alleged Deficiencies in Cross-Examination of Other Witnesses

Petitioner alleges that Mr. Plaisted forgot to ask one question while cross-examining Kamisha Holmen, Walker's girlfriend:  whether she knew Curry or ever saw him with money, drugs or weapons. One cannot know if the answer to that question would have been yes or no.  If she said that she did not know Curry and never saw him with money, drugs or weapons, that testimony would have been little benefit to Curry, but the risk of a "yes" answer could be very damaging.  It was not ineffective to avoid that risk for very little gain.

Curry further claims that Mr. Plaisted's questions about the construction associated with the grand opening of Curry's clothing store, the Closet, opened the door to the prosecution delving into who paid for the construction project. Given the Government's evidence regarding Curry's involvement in the opening of the Closet, it is absurd to think the Government would not have cross-examined Tahirou Ndiaye about who paid for the construction costs associated with opening the Closet regardless of Mr. Plaisted's questions. The door was opened to this line of questioning the moment Ndiaye said anything about Curry's business interest in the Closet. Since the very purpose of Ndiaye's testimony was to establish Curry's involvement in the Closet, there was no way Mr. Plaisted could have questioned Ndiaye in a manner that would have prevented the prosecution from inquiring about the renovation costs and who paid them.

**b. Petitioner Was Not Prejudiced By Counsel's Cross-Examination Of Witnesses**

The above paragraphs of minor points makes clear that, had Mr. Plaisted conducted cross-examination as Curry now claims he should have, it would not have affected the outcome of the trial. Each choice by counsel had both an upside and a downside. Weighing the strategy is counsel's job, and Mr. Plaisted did it well during long, hotly-contested trial proceedings that spanned years. He knew the evidence intimately and knew how to minimize the risk of a bad answer. He was highly prepared, which helped him avoid asking the questions that could boomerang on his client.

**vi.     Counsel's Alleged Failure To Object To Inadmissible Evidence**

Curry contends that he was denied the effective assistance of trial counsel due to counsel's failure to properly object to the admissibility of key evidence and testimony, leading to admission of evidence that was improper or prejudicial. Curry specifically argues that the trial record is replete with instances in which counsel failed to object to leading questions.

44

It is well established that counsel can be ineffective for not objecting to inadmissible evidence. *Medina v. Diguglielmo*, 461 F.3d 417 (3d Cir. 2006) ("trial counsel's failure to object . . . fell below an objective standard of reasonableness," and therefore, counsel was ineffective); *Everett v. Beard*, 290 F.3d 500, 513-15 (3d Cir. 2002) (counsel was ineffective due to failure to object). However, the use and timing of objections at trial is a quintessential matter of strategy and discretion on the part of the trial attorney and will very seldom constitute objectively deficient representation. *United States v. Nguyen*, 379 F. App'x 177, 181 (3d Cir. 2010), *cert. denied*, 131 S. Ct. 1535 (2011).

### a.   Mr. Plaisted Was Not Ineffective In Handling Evidentiary Objections

Petitioner claims that there were two particular instances in which counsel's performance was substantially ineffective and prejudicial to Petitioner. First, Petitioner maintains that "counsel stood by and listen[ed] to Walker testify as to Petitioner's state of mind during the crucial testimony about the day of Petitioner's arrest, and failed to object." Curry argues that reasonably effective counsel should know that a witness cannot testify regarding what a defendant meant. Second, Curry claims that at the outset of trial, when Walker took the stand as the first prosecution witness, Mr. Plaisted failed to object to Walker's testimony about his own prior criminal activity, which included testimony about Curry and other co-conspirators. Curry argues that Walker's testimony of "bad acts" that involved Curry when he was a juvenile set the tone for the trial and that Mr. Plaisted's failure to object to the admission of this evidence rendered his assistance of counsel ineffective.

First, Curry claims that Mr. Plaisted should have objected to what he characterizes as leading questions but does not allege that this resulted in the admission of prejudicial evidence. Thus, this is a non-issue. Counsel often choose not to object to leading questions as a matter of

strategy.

Second, Curry claims that Mr. Plaisted allowed Walker to testify about Curry's state of mind, quoting selectively from some of the questions the prosecution asked Walker about the consensual audio recording made of Walker's conversation with Curry prior to Curry's arrest. During this audio recording, Walker met with Curry in Curry's van and returned to Curry the heroin he had been holding for Curry.  A review of the full record of the line of questioning shows that Walker was providing the context of the conversation, explaining slang terms that the gang used, and providing his understanding of what certain words meant.  *See United States v. De Peri*, 778 F.2d 963, 977 (3d Cir. 1985).  Walker was not testifying to Curry's state of mind. For example, the first quotation cited by Curry, was "Q. When Mr. Curry says we can't roll in this shit what is he referring to?"  Walker's response was, "He was referring to the van, his vehicle, Mr. Curry's vehicle and he was riding at that time."  As Walker had already explained, this conversation took place inside Curry's van.  The phrase "we can't roll in this shit," had a meaning different than the Webster's definition of those words would imply.  Walker, being a member of the gang and a participant in the conversation, understood the slang meaning of the phrase and the context in which the words were used.  As his answer demonstrates, he was being asked to explain a slang phrase, not to testify as to Curry's state of mind. *See United States v. O'Grady*, 280 F. App'x 124, 130 (3d Cir. 2008) (witness properly interpreted defendant's statement, "You guys are hot," as bespeaking defendant's concern "that law enforcement is taking an interest or looking into our activities" because the term "hot" was ambiguous).

Similarly, the phrase "we can't roll in this Pooh what if Union County get on us" also had a specific meaning within the gang and a particular relevance given the context of the conversation.  Walker's response to this question explained what he understood the statement to

mean given the context, namely that Union County Police had a pursuit policy that was different than the police in Essex County, which made it less likely that Curry could evade law enforcement if he were pulled over with the heroin in his van by Union County Police.  Walker was not testifying about Curry's state of mind, but rather explaining his own understanding of the words spoken to him in the conversation.

Similarly, Curry's command to Walker, "get that shit, put it in the trunk of that or whatever you want to do," had a particular meaning in the context of the conversation.  Walker understood the command:  "that shit" meant the heroin that was then sitting on the floor of Curry's van between Curry and Walker and "the trunk" was a reference to a Chevy Lumina that Curry had given to Walker which was sitting in the driveway next to Curry and Walker.  Once again, Walker provided context to explain the meaning of slang.  Walker did not testify about Curry's state of mind.

Similarly, the question about Curry's statement to Walker, "that is why I told you put it in there, let's go meet the dummies so they won't know where your mother live at. I'll get the truck from them and given them this," did not elicit testimony about Curry's state of mind.  As Walker explained, "the dummies" was the gang's nickname for drug co-conspirators Jason and Justin Hannibal, and "the truck" was a Jeep Cherokee the gang used to transport drugs.  The objection that Curry now says Mr. Plaisted should have made is meritless and surely not ineffective assistance of counsel.

Curry's second claim - that Mr. Plaisted failed to object to Walker's testimony about his own prior criminal activity, which included testimony about Curry and other co-conspirators -  is also without merit.  Mr. Plaisted did move to exclude this evidence in his pretrial motions, and this Court denied the motion.  That issue is not germane now because it could have been raised

47

in the direct appeal.  What Petitioner now contends is ineffective assistance is that Mr. Plaisted should have continued to object in front of the jury even after this Court had ruled it admissible. Mr. Plaisted had properly preserved the issue for appeal; there was no benefit to Curry for him to continue objecting to evidence that had been ruled admissible.

Curry cites nothing in the record to support his suggestion that the Court allowed the admission of evidence that was beyond the scope of its rulings because Mr. Plaisted failed to repeatedly restate his objection.  This Court clearly ruled what evidence was admissible and what evidence was not admissible.  Both parties understood this Court's rulings on evidence.  Curry's claim is more an attack on this Court's rulings than it is on Mr. Plaisted's actions.  For example, Curry argues that "the breadth of testimony of uncharged bad acts in this case was unprecedented."  However, this Court's admission of this evidence has already been upheld on appeal, *Baskerville*, 339 F. App'x at 179, and Curry cannot now collaterally attack that evidentiary ruling by attacking Mr. Plaisted's competence.  Moreover, objecting to this evidence in front of the jury, knowing that the objection would have been overruled, would have only served to highlight this evidence.

### b.  There Was No Prejudice To Petitioner

Walker did not testify to Curry's state of mind, and thus, even if Mr. Plaisted had objected, this evidence would have been admitted at trial and its admission would have been sustained on appeal as consistent with a sound exercise of discretion.  *See De Peri*, 778 F.2d at 977; *see also O'Grady*, 280 F. App'x at 130.  Moreover, that evidence had little impact on the outcome of the trial because there was such overwhelming independent evidence of Curry's knowledge of, and intentional participation in, the charged narcotics conspiracy and money laundering.  As for Curry's other claim, both this Court and the Third Circuit ruled that evidence

of Walker's prior criminal activity, including that which he engaged in with Curry, was properly admitted at trial. Accordingly, Curry cannot show prejudice.

### vii.     Counsel's Alleged Failure To Adequately Prepare For Trial

Petitioner argues that Mr. Plaisted was totally unprepared for trial and was therefore constitutionally ineffective. Specifically, he claims that "it is [his] contention that no attorney could possibly have provided the effective assistance of counsel guaranteed by the Sixth Amendment of the Constitution of the United States when thrust into a case this complicated just days before the start of trial, particularly one who had never previously tried a drug conspiracy case like this one." Petitioner further contends that it was counsel's lack of preparation which deprived him the effective assistance of counsel.

This Court first notes that this claim is entirely false factually. This Court watched, read and listened to thorough, prepared and cogent arguments by Mr. Plaisted for at least three years. He was in this case from start to finish with a dedicated, hard-working team at his side. He filed literally scores of complex motions involving hundreds of wiretap phone calls and thousands of pages of evidence. His career as an AUSA and then a defense attorney with a renowned law firm is impressive.

Secondly, this claim is legally barred because the Third Circuit has already rejected the claim on direct appeal, when it affirmed this Court's ruling in its February 2007 Statement of Reasons. *United States v. Baskerville*, 339 F. App'x 176, 178 (3d Cir. 2009); *United States v. Curry*, Crim. No. 04-280 (D.N.J. Feb. 13, 2007)

Curry's claim that Mr. Plaisted was ineffective because Curry "was sentenced to life plus sixty years" is similarly meritless. While it is accurate that Curry was sentenced to life plus sixty years' imprisonment upon his conviction, that sentence was legally proper pursuant to the

statutes under which Curry was convicted and the applicable guideline ranges found by the United States Probation Office and this Court.  Curry does not argue otherwise here.  To now say that Mr. Plaisted was ineffective because the Bureau of Prisons sent Curry to a facility in Colorado rather than Pennsylvania is utterly baseless.  The propriety and reasonableness of the sentence were properly the subject of direct appeal; if he had any grounds for appeal on that basis Curry's appellate counsel, Lawrence Lustberg, Esq., one of the finest lawyers in the criminal defense bar, would have raised it.  And the prison selected is within the sole discretion of the Bureau of Prisons.

### viii.   Counsel's Alleged Failure To Conduct An Adequate Defense For A Totality Of Reasons

Petitioner's final contention is that even if no single error by counsel amounts to ineffective assistance of counsel, that the cumulative effect of counsel's errors requires habeas corpus relief.  *See United States ex rel. Sullivan v. Cuyler*, 631 F.2d 14, 17 (3d Cir. 1980).

Where this Court has already determined that no errors exist, the sum of these cumulative non-errors does not become ineffective assistance of counsel.  *See, e.g., United States v. Powell*, 444 F. App'x 517, 522 (3d Cir. 2011) ("The cumulative effect of each non-error does not rise to constitutional error; as the saying goes, zero plus zero equals zero.").  This Court commends the exceptionally thorough work of Curry's current counsel, as well as his appellate counsel, Mr. Lustberg, and his entire trial team.  They toiled long hours for years to afford Curry every possible defense to the serious criminal charges against him.  Curry worked closely with each of them, as he does now, focusing on every possible nuance of fact and how that might release him from the prison term he endures.  The same drive, determination, intelligence and charm he exhibited through the hundreds hours of wiretapped calls and witness descriptions were the character traits that created an exceptionally profitable drug empire, where his will prevailed

50

over all others.  His focus and willingness to punish anyone who defied him kept his enterprise together with discipline.  One cannot help but wonder what such talents could have built if they were directed toward lawful goals by lawful means.  But this never happened, because his years of crime caught up with him before he could shake away from them.  His will to control the witnesses and the trial continued unabated even after his arrest and pretrial detention.  His conviction rests upon the evidence and the law and did not occur because counsel was ineffective in any way.  The best lawyers in the world cannot alter the facts.

Therefore, Petitioner's § 2255 motion is denied because he has failed to demonstrate that he received ineffective assistance of counsel, nor that he suffered any prejudice as a result of counsels' actions.

## III. CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. § 2253(c)(1)(B), unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken from a final order in a proceeding under 28 U.S.C. § 2255.  A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."  *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).

Here, Petitioner failed to make a substantial showing of a denial of a constitutional right. For the reasons stated herein, no jurist of reason would disagree with this Court's resolution of Petitioner's claims and no certificate of appealability will issue.

**IV. CONCLUSION**

For the reasons stated above, Petitioner's motion is **DENIED**.  An appropriate Order follows.

Dated:  February 20, 2015

s/ Faith S. Hochberg
Faith S. Hochberg, U.S.D.J.
